Filed 9/4/14  In re Di. B. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re DI. B. et al., Persons Coming Under the Juvenile Court Law. | B253195 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.Y.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK00225 ) |

APPEAL from orders of the Superior Court of Los Angeles County, Akemi D. Arakaki, Judge.  Affirmed.

David A. Hamilton, under appointment by the Court of Appeal for Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Respondent.

_____

## INTRODUCTION

M.Y. (Mother) appeals from juvenile court orders asserting dependency jurisdiction over her children, Drew and Di. On appeal, Mother contends the children's father was capable and willing to care for the minors and, thus, the court erred in finding a basis for exercising dependency jurisdiction. We disagree and affirm the juvenile court's orders.

## FACTS

Mother and D.B. (Father)[1] are the parents of Drew (born in May 2010) and Di. (born in November 2008). Mother and Father live separately. As a result of a March 13, 2013 restraining order dispute, the family court ordered the parents to have joint legal custody of the minors, and ordered Mother to have sole physical custody. The family court provided regular visitation for Father every Monday and Wednesday in the early evening, and on the first, third, and fifth weekends of each month from Friday evening to Sunday evening

On July 24, 2013, the family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) when law enforcement found Mother and the minors sleeping in her car underneath the freeway. Due to Mother "having an altered mental status," she and the minors were then transported by ambulance to Kaiser Permanente's Woodland Hills hospital (Kaiser).

Upon arrival, Mother was "assessed to have overdosed on Ambien" and "could not recall how she arrived at the hospital." Although legally prescribed the Ambien sleeping medication for insomnia, she took somewhere between six and nine pills, far more than the prescribed amount. She claimed that the prescription was to combat depression; Kaiser's intake assessment indicated that she "[had] suicidal ideation." Mother stated that she intentionally ingested the large dose of Ambien, but denied that she did so to kill herself. She admitted that she needed to seek hospitalization and was then placed on an involuntary hold pursuant to Welfare and Institutions Code section

---

[1]     Father is a not party in the current appeal.

2

5150[2] for "being a danger to self."[3]  A social worker at the hospital called Father to pick up the children and they have resided with him since then.

Shortly thereafter, Mother was transferred to Alhambra Hospital where she underwent an evaluation and treatment for her "psychiatric condition."   Mother reported feeling depressed, sad, and anxious due to financial and maternal stresses.  Though she reiterated that she did not want to kill herself, she was assessed to have "impaired insight and judgment" and was admitted for further "treatment and stabilization."  Mother was discharged from the hospital on July 28, 2013, with a recommendation to "follow-up with further psychiatric services."  DCFS initiated an investigation to gather more information on the family situation.

DCFS learned that Mother and minors had been residing with her mother (maternal grandmother) in Agoura Hills since 2011.  When interviewed by the children's social worker (CSW), Mother admitted to living in her car with the minors for three days while grandmother was out of town because she "didn't want to stay in the home without her" and "had to do what she had to do."  Mother said this living situation was only temporary, but Father maintained that Mother "[was] an opportunist" and had a history of vagrant tendencies.  Father told the CSW that he was unaware of Mother's housing situation but that, "[s]he stayed at a shelter for domestic violence victims . . . to get section 8 [housing]."  Father said that Mother "bounced around from hotel to hotel," and that "he observed things in the children's bags that looked like 'they were trying to survive.'"

When asked about his relationship with Mother, Father stated that it started out well, but deteriorated after only a few months.  He said that in 2007, after he told Mother that he wanted to mend his relationship with the mother of his other children, Mother "went bizerk [*sic*]," and tried to kill herself by taking double the amount of "a bunch of

---

[2]     All further section references are to the Welfare and Institutions Code.

[3]     An individual may be involuntarily hospitalized "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled."  (§ 5150, subd. (a).)

3

pills." She was missing for a few days and he went to visit her after he learned she was involuntarily hospitalized "for 5150" after the hospital assessed that she attempted to kill herself.[4] Afterwards, Father claimed he tried to help her but "[s]he went from trying to hurt herself to trying to hurt [him]" and had "chased [him] with knives and all kind of stuff."

Father produced a lengthy letter that Mother posted to Twitter which contained strong language exhibiting suicidal intentions. In the letter, Mother wrote, "[t]oday is the day that I decided to remove myself from [the] world," "this time I won't be around to see what tomorrow will bring," "I'm out of options. . . . I'm out of time," before concluding with, "I'm sorry to my friends but I was just feeling so tortured."

When the CSW asked Mother about the letter and the various allegations of suicidal intent, Mother denied ever being suicidal, and claimed Father was abusive and that she felt she needed family counseling. She attributed her first involuntary hospitalization to financial hardship, being down, and being tired. Mother confirmed that she did write the letter provided by Father, but stated she did so as an "expression . . . to help others."

When asked about the most recent hospitalization, Mother refused to divulge much information regarding her mental health status. Mother also refused to cooperate when CSW attempted to arrange a safety plan for the children. Though she admitted she took six Ambien pills that evening, three times her prescribed amount, she later amended her statement to clarify that she did not take the pills while the children were in her care.

In its August 29, 2013 jurisdiction and disposition report, DCFS noted that a CSW spoke with Father's friend (A.P.) and Di. on July 25, 2013. The CSW noted that both children appeared to be in good health and "age developmentally appropriate." Neither child exhibited any signs of physical abuse. Di. seemed happy and talkative and stated her desire to see her mother despite liking and wanting to continue living with Father. Di. did not know where Mother was, but acknowledged that Mother went to the hospital

---

[4]     Mother claims the incident occurred in 2006

4

in an ambulance because "she did not feel good." She denied that her father abused her, but told CSW that "mommy treats [the children] bad" and that they cry when "mommy spanks them on the butt with her hands." When asked about her living situation, Di. told CSW that she, Mother, and Drew had lived in at least two shelters, currently lived in the car, and that "mother told her to keep living in a car a secret."

Drew refused to make eye contact with CSW and shook his head "no" when CSW attempted to talk to him. When the CSW asked Drew if he liked living with Father, felt safe living with him, and asked if he lived in a car with his mother, Drew nodded his head "yes" to all three questions.

DCFS's report concluded that, although both parents were employed and desired to be with the children, the agency did not believe it was in the children's best interests to remain in Mother's care at the time.

On July 31, 2013, DCFS filed a section 300 petition on behalf of the minors. The petition alleged mother exhibited emotional and mental issues which subjected the minors to risks of physical harm within the meaning of section 300, subdivision (b)(1), and that mother's inability to provide stable housing placed the minors in "a detrimental and endangering situation" under section 300, subdivision (g).

At the November 13, 2013 dependency hearing, the juvenile court found that DCFS made reasonable efforts to "prevent or eliminate need for minor's removal from home." The court sustained the petition, finding there was "a substantial danger if the children were returned home . . . without removing the children from the mother's physical custody." Mother timely appealed.

## DISCUSSION

Mother's sole contention on appeal is that the juvenile court erred in exercising dependency jurisdiction over her children because their father was capable and willing to care for them and their well-being was not endangered. We disagree.

## I. Standard of Review

In the juvenile court, "[p]roof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a); Cal. Rules of Court, rule 5.684(f); *In re Sheila B*. (1993) 19 Cal.App.4th 187, 198; *In re A.G.* (2013) 220 Cal.App.4th 675, 682-683.) DCFS ultimately filed its section 300 petition and the juvenile court sustained that petition pursuant to subdivisions (b)(1) and (g). Subdivision (b)(1) states that any child described as "[having] suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent guarDi.n to adequately supervise or protect the child, . . . or negligent failure of the parent or guarDi.n to provide child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guarDi.n to provide regular care for the child due to the parent's or guarDi.n's mental illness, developmental disability, or substance abuse" falls under the jurisdiction of the juvenile dependency court. (§ 300, subd. (b)(1).) A child may also be declared a dependent of the court if "[t]he child has been left without any provision for support . . . the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custoDi.n with whom the child resides or has been left is unwilling or unable to provide care or support for the child . . . ." (§ 300, subd. (g).) When making its determinations, courts may consider a parent's past conduct to be "probative of current conditions" if there is "'some reason to believe [the conduct] may continue in the future.'" (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 824.)

Additionally, juvenile courts need not wait until a child is harmed to intervene to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159,165.) In sustaining DCFS's petition, the juvenile court implicitly found the allegations of Mother's past and current conduct to be sufficiently factual by a preponderance of the evidence.

When the juvenile court's findings are challenged on appeal, the standard of review is "the same as in other appeals on grounds of insufficiency of the evidence. [The courts] review the record to determine whether there is any substantial evidence,

contradicted or not, which supports the court's conclusions. 'All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.'" (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1649; accord *In re Luke M*. (2003) 107 Cal.App.4th 1412, 1426.) This court will affirm the jurisdictional order if *any* of the juvenile court's grounds are supported by substantial evidence. (*In re Jonathan B*. (1992) 5 Cal.App.4th 873, 875 ["[a] reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"]; see also *In re Alexis E*. (2009) 171 Cal.App.4th 438, 451.)

## II.    Dependency Jurisdiction Was Proper

Mother does not contest her conduct placed the minors at substantial risk of harm, but instead only argues the juvenile court erred in sustaining the section 300 petition because Father was willing and able to adequately provide care and support for the minors in her absence. We find dependency jurisdiction over the minors was necessary and proper to ensure their protection.

Here, the juvenile court sustained the section 300 petition on the aggregation of Mother's detrimental conduct. It is unquestioned even by Mother that ingesting three times the prescribed amount of a sedative and driving with minors in the vehicle to the point that she overdosed and passed out at the side of a public roadway placed the minors at a substantial risk of harm. Mother could have fainted behind the wheel and crashed the car at a high speed and it is extremely fortunate that nobody was actually harmed as a result of her dangerous conduct. When taking into consideration Mother's prior involuntary hospitalizations, suicidal ideations, and alleged drug abuse and violent behavior, the court reasonably determined there was substantial evidence demonstrating that the minors were *at least* subjected to serious *risks* of harm. Mother has exhibited a pattern of poor judgment and under the circumstances, her children could one day suffer actual harmed as a result.

Mother argues on appeal that, because of Father's intervention, the children were neither harmed nor faced a risk of harm as a result of her conduct. Therefore, the juvenile court lacked substantial evidence to assert dependency jurisdiction over her children. Mother asks us to remand the matter to the family court instead to address custody and visitation issues. Mother relies on *In re A.G., supra,* 220 Cal.App.4th 675, *In re Phoenix B.* (1990) 218 Cal.App.3d 787, and *In re James R.* (2009) 176 Cal.App.4th 129, all of which are factually distinguishable.

In *In re A.G.*, the juvenile court sustained a petition that alleged only that the mother was mentally ill and unable to care for the children. However, the father showed he was able to protect the children from any harm from the mother's mental illness: he ensured there was adult supervision, other than the mother, of the children at all times; he slept in the bedroom with the children and kept the door locked; he temporarily moved out of the house with the children to protect them from the mother. (*In re A.G., supra*, at p. 685.) The *In re A.G.* court reasoned, "matters such as this one belong in family court . . . [¶] Accordingly, we conclude that the juvenile court erred in sustaining a petition that alleged only that Mother is mentally ill and is unable to care for the minors where Father has always been, and is, capable of properly caring for them. At the adjudication hearing, the juvenile court should have dismissed the petition, staying the order until Father obtained from the family court an award of custody to him and monitored visitation to Mother." (*Id.* at p. 686.)

Similarly, in *In re Phoenix B., supra,* 218 Cal.App.3d 787, the juvenile court properly declined to assert dependency jurisdiction since the father was found to be willing and able to take care of the child. Because there was no court order awarding custody to the mother, the father was equally entitled to custody. (*Id.* at p. 792.) In *In re James R., supra,* 176 Cal.App.4th 129, jurisdiction was improperly taken because the mother had a one-time adverse reaction to taking eight ibuprofen with beer. There was no evidence the children were harmed in any way or were at risk of harm. Further, the father and extended family assisted with child care. (*Id.* at p. 136.)

8

Unlike *In re A.G.* and *In re Phoenix B.,* there was a custody order in place with regard to Di. and Drew. The juvenile court's order placing the children with Father at the detention hearing did not automatically override the family court's order giving custody to mother. Neither did it erase Mother's detrimental conduct. Unlike in *In re A.G.* and *In re James R.*, Father was not in the home, caring for the children at the time of the events giving rise to jurisdiction.

Further, Father attempted to alert the family court to the fact that Mother had the children sleeping in the car. He "was told her housing issues were not an offense." It is unclear if Father could simply have obtained from the family court an award of custody to him and monitored visitation to Mother, as suggested by *In re A.G.* In any case, the juvenile court put the matter over for receipt of a family law order after it asserted dependency jurisdiction. Upon receipt of the custody order, jurisdiction was terminated. Any further issues relating to custody and visitation may be addressed in family court. But these subsequent events do not cast doubt on the correctness of the juvenile court's jurisdiction determination.

## DISPOSITION

The dependency court's jurisdictional and dispositional findings and orders are affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

GRIMES, J.

9